**Case No. 26-2213**

**IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

VIRGINIA STATE CONFERENCE NAACP, ET AL.,

*Plaintiffs-Appellees,*

v.

COUNTY SCHOOL BOARD OF SHENANDOAH COUNTY,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Virginia
Case No. 5:24-cv-00040 – Hon. Michael F. Urbanski

# OPENING BRIEF OF APPELLANT

Michael Francisco
James Compton
FIRST & FOURTEENTH PLLC
800 Connecticut Avenue, NW
Suite 300
Washington D.C. 20006
(202) 998-1978
michael@first-fourteenth.com
james@first-fourteenth.com

Zachary T. Reynolds
FIRST & FOURTEENTH PLLC
2 N. Cascade Avenue,
Suite 1430
Colorado Springs, CO 80903
(719) 429-4937
zack@first-fourteenth.com

*Counsel for Appellant County School Board of Shenandoah County*

## CORPORATE DISCLOSURE STATEMENT

Appellant County School Board of Shenandoah County is a political subdivision of the Commonwealth of Virginia. It has no parent corporation, and no publicly held corporation owns any of its stock.

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

# DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-2213 Caption: Virginia State Conference NAACP v. Cnty Sch Brd of Shenandoah Cnty

Pursuant to FRAP 26.1 and Local Rule 26.1,

County School Board of Shenandoah County
(name of party/amicus)

who is defendant-appellant, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is

pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Michael Francisco Date: 10/27/2026

Counsel for: Defendant-Appellant

# TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT .......... i

DISCLOSURE STATEMENT .......... ii

TABLE OF CONTENTS .......... iv

TABLE OF AUTHORITIES .......... vii

INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 3

STATEMENT OF ISSUES .......... 4

STATEMENT OF THE CASE .......... 4

- I. The Community and Its Schools .......... 4
- II. School Name Removal and Restoration .......... 5
  - A. The 2020 Board retires the names but keeps the mascot .......... 5
  - B. Voters elect a new Board, and a 2022 motion fails .......... 7
  - C. The 2024 Board restores the names .......... 8
  - D. The 2024 Board's intent .......... 9
  - E. Historical origins of the names .......... 11
- III. Plaintiffs Sue .......... 12
  - A. Plaintiffs' alleged injuries .......... 13
- IV. Proceedings Below .......... 16
  - A. The district court grants Plaintiffs' motion for summary judgment .......... 16

B. The district court rules against the School Board on the remaining issues ........ 16

SUMMARY OF ARGUMENT ........ 17

STANDARD OF REVIEW ........ 19

ARGUMENT ........ 20

V. The District Court Erred in Granting Summary Judgment on the Compelled-Speech Claim ........ 20

A. Wearing school uniforms does not qualify as expressive conduct ........ 22

B. The Board, not the students, spoke ........ 28

C. Applying strict scrutiny creates a limitless heckler's veto ........ 30

D. Students are not compelled to speak because their participation in extracurricular activities is voluntary ........ 33

E. The injunction is overbroad ........ 34

VI. The District Court Erred in Ruling Against the School Board on the Equal Protection Claim ........ 35

A. The Equal Protection Framework and the Presumption of Legislative Good Faith ........ 36

B. The District Court Erroneously Relied on Stigmatic Harm as Evidence of Disproportionate Impact ........ 38

C. The District Court Did Not Properly Afford the School Board a Presumption of Good Faith ........ 44

D. Application of the Presumption of Good Faith Cannot Support a Finding of Invidious Discriminatory Intent ........ 49

E. The Board Offered Legitimate, Non-Racial Reasons for Restoring the Original Names ....................................53

F. The 2024 Board's Restoration Decision Easily Survives Rational Basis Review ......................................56

VII. The Title VI Claim Fails with the Equal Protection Claim ........................................................................57

VIII. The District Court Erred in Holding That the Restoration Decision Violated the Equal Educational Opportunities Act ...........................................................58

A. The EEOA's Text Does Not Encompass Confederate School Names ........................................................59

B. "Vestiges" Means Operational Remnants of a Dual System, Not Historic School Names.................................61

C. The Causal Link Between the Restored Names and the De Jure System Is Too Remote and Too Attenuated........................................................................66

D. The Court Imposed an Affirmative Duty the EEOA Does Not Create ...........................................................67

CONCLUSION ........................................................................68

STATEMENT REGARDING ORAL ARGUMENT............................69

CERTIFICATE OF COMPLIANCE ................................................70

CERTIFICATE OF SERVICE.........................................................71

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott v. Perez*,
585 U.S. 579 (2018) .......... *passim*

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .......... 57

*Allen v. Wright*,
468 U.S. 737 (1984) .......... 41, 43

*Anderson v. Sch. Bd. of Madison Cnty.*,
517 F.3d 292 (5th Cir. 2008) .......... 63

*Augustus v. Sch. Bd. of Escambia Cnty.*,
507 F.2d 152 (5th Cir. 1975) .......... 42, 64, 65

*Axson-Flynn v. Johnson*,
356 F.3d 1277 (10th Cir. 2004) .......... 30, 31

*Ayotte v. Planned Parenthood of N. New Eng.*,
546 U.S. 320 (2006) .......... 34

*Banks v. Muncie Cmty. Schs.*,
433 F.2d 292 (7th Cir. 1970) .......... 42, 65

*Belk v. Charlotte-Mecklenburg Bd. of Educ.*,
269 F.3d 305 (4th Cir. 2001) .......... 62, 67

*Berger v. Battaglia*,
779 F.2d 992 (4th Cir. 1985) .......... 22

*Berry v. Sch. Dist. of Benton Harbor*,
195 F. Supp. 2d 971 (W.D. Mich. 2002) .......... 63

*Blau v. Fort Thomas Pub. Sch. Dist.*,
401 F.3d 381 (6th Cir. 2005)........................................................................32

*Califano v. Yamasaki*,
442 U.S. 682 (1979)........................................................................34

*City of Mobile v. Bolden*,
446 U.S. 55 (1980)........................................................................37

*Coal. for TJ v. Fairfax Cnty. Sch. Bd.*,
68 F.4th 864 (4th Cir. 2023)........................................................................*passim*

*Coal. to Save Our Child. v. State Bd. of Educ.*,
90 F.3d 752 (3d Cir. 1996)........................................................................62, 63

*Coleman v. Miller*,
117 F.3d 527 (11th Cir. 1997)........................................................................38, 40

*Crawford v. Bd. of Educ.*,
458 U.S. 527 (1982)........................................................................48

*Cressman v. Thompson*,
798 F.3d 938 (10th Cir. 2015)........................................................................22, 23, 26

*Crosby v. Holsinger*,
816 F.2d 162 (4th Cir. 1987)........................................................................42

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)........................................................................51

*Doe ex rel. Doe v. Lower Merion Sch. Dist.*,
665 F.3d 524 (3d Cir. 2011)........................................................................38, 41

*Farm Lab. Org. Comm. v. Stein*,
56 F.4th 339 (4th Cir. 2022)........................................................................46

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993)........................................................................57

*Freeman v. Pitts*,
503 U.S. 467 (1992) ................................................................62, 66, 67

*Frudden v. Pilling*,
742 F.3d 1199 (9th Cir. 2014) ..........................................................24, 25

*Frudden v. Pilling*,
877 F.3d 821 (9th Cir. 2017) ......................................................25, 29, 33

*Gomillion v. Lightfoot*,
364 U.S. 339 (1960) ..........................................................................55

*Gray v. Lowndes Cnty. Sch. Dist.*,
900 F. Supp. 2d 703 (N.D. Miss. 2012) ...............................................65

*Green v. County School Board of New Kent County*,
391 U.S. 430 (1968) ........................................................61, 62, 63, 68

*Hanover Cnty. Unit of the NAACP v. Hanover Cnty.*,
461 F. Supp. 3d 280 (E.D. Va. 2020) ...................................................59

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988) ..........................................................................30

*Heller v. Doe*,
509 U.S. 312 (1993) ..........................................................................57

*Jacobs v. Clark Cnty. Sch. Dist.*,
526 F.3d 419 (9th Cir. 2008) .........................................................*passim*

*Johnson v. Mayor of Jacksonville*,
178 F.4th 1240 (11th Cir. 2026) ..........................................................42

*Louisiana v. Callais*,
146 S. Ct. 1131 (2026) ......................................................................56

*Mendoza v. Tucson Unified Sch. Dist.*,
125 F.4th 1262 (9th Cir. 2025) ........................................................... 63

*Mitchell v. La. High Sch. Athletic Ass'n*,
430 F.2d 1155 (5th Cir. 1970) ........................................................... 34

*Moore v. Bryant*,
853 F.3d 245 (5th Cir. 2017) ........................................................... 42

*NAACP v. Hunt*,
891 F.2d 1555 (11th Cir. 1990) ........................................................... 38, 41

*N.C. A. Philip Randolph Inst. v. N.C. State Bd. of Elections*,
155 F.4th 298 (4th Cir. 2025) ........................................................... 19, 20, 47

*N.C. State Conf. of the NAACP v. McCrory*,
831 F.3d 204 (4th Cir. 2016) ........................................................... 19, 51

*N.C. State Conf. of the NAACP v. Raymond*,
981 F.3d 295 (4th Cir. 2020) ........................................................... *passim*

*Palmer v. Thompson*,
403 U.S. 217 (1971) ........................................................... 41

*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979) ........................................................... 37

*Peters v. Jenney*,
327 F.3d 307 (4th Cir. 2003) ........................................................... 57

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009) ........................................................... 27, 28

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006) ........................................................... 23, 27

*Shelby County v. Holder*,
570 U.S. 529 (2013) ........................................................... 51

*Smith v. St. Tammany Par. Sch. Bd.*,
316 F. Supp. 1174 (E.D. La. 1970),
*aff'd*, 448 F.2d 414 (5th Cir. 1971) ....................42, 64

*Spence v. Washington*,
418 U.S. 405 (1974) ....................23, 25, 26

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
402 U.S. 1 (1971) ....................61

*Texas v. Johnson*,
491 U.S. 397 (1989) ....................23

*Troster v. Pa. State Dep't of Corr.*,
65 F.3d 1086 (3d Cir. 1995) ....................24

*United States v. City of Yonkers*,
833 F. Supp. 214 (S.D.N.Y. 1993) ....................63

*United States v. Overton*,
834 F.2d 1171 (5th Cir. 1987) ....................64

*United States v. School District of Ferndale*,
577 F.2d 1339 (6th Cir. 1978) ....................13

*Vernonia Sch. Dist. 47J v. Acton*,
515 U.S. 646 (1995) ....................34

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252 (1977) ....................*passim*

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015) ....................22, 28

*Washington v. Davis*,
426 U.S. 229 (1976) ....................43

*Wessmann v. Gittens*,
160 F.3d 790 (1st Cir. 1998) ....................................................62

*West Virginia State Board of Education v. Barnette*,
319 U.S. 624 (1943) ....................................................28, 29, 30

*Whitcomb v. Chavis*,
403 U.S. 124 (1971) ....................................................41

*Wood v. Arnold*,
915 F.3d 308 (4th Cir. 2019) ....................................................19, 30

*Wooley v. Maynard*,
430 U.S. 705 (1977) ....................................................23, 28, 29, 30, 35

**Statutes**

20 U.S.C. § 1701 ....................................................3

20 U.S.C. § 1701(b) ....................................................59

20 U.S.C. § 1702(a) ....................................................59, 60

20 U.S.C. § 1703 ....................................................59

20 U.S.C. § 1703(a) ....................................................60

20 U.S.C. § 1703(b) ....................................................*passim*

20 U.S.C. § 1703(c) ....................................................60

20 U.S.C. § 1703(d) ....................................................60

20 U.S.C. § 1703(e) ....................................................60

20 U.S.C. § 1706 ....................................................3

20 U.S.C. § 1712 ....................................................................... 67

20 U.S.C. §§ 1712–18 ................................................................ 60

20 U.S.C. § 1713(g) .................................................................. 67

28 U.S.C. § 1291 ....................................................................... 4

28 U.S.C. § 1331 ....................................................................... 3

28 U.S.C. § 1343(a)(3) ................................................................ 3

42 U.S.C. § 1983 ................................................................. 3, 13

42 U.S.C. § 2000d ............................................................... 3, 57

**Rules**

Fed. R. App. P. 32(a)(5) ............................................................ 70

Fed. R. App. P. 32(a)(6) ............................................................ 70

Fed. R. App. P. 32(a)(7)(B) ........................................................ 70

Fed. R. App. P. 32(f) .................................................................. 70

4th Cir. R. 34(a) ........................................................................ 69

## INTRODUCTION

This case concerns a local school board's decision in 2024, after extensive community engagement, to restore two school names involving two well-known civil war figures: Stonewall Jackson and Robert E. Lee. The district court, at Plaintiffs' urging, declared this decision unconstitutional as a violation of Free Speech and the Equal Protection Clause. According to the district court, the association of these figures with the Confederacy makes the names (and school nickname "Generals") unconstitutional.

To strike down the schools' names, the district court had to innovate on every doctrine it touched. The court held that requiring students to wear jerseys with their team's name ("Generals") is compelled speech in violation of the First Amendment, that the 2024 Board was motivated by invidious discriminatory intent to reinstate the names in violation of the Equal Protection Clause and Title VI, and that the schools' names are unlawful "vestige[s] of a dual school system" in violation of the Equal Educational Opportunities Act. The court also struck out into new historical territory: the United States is filled with institutions named after men who have been accused of moral failings association with

slavery. Government institutions across this Circuit bear the names of George Washington, Thomas Jefferson, George Mason and other slaveholders.

To reach its novel conclusions, the court below wrongly constitutionalized a heartfelt disagreement about the name of a local school, overruling the good faith judgment of local officials. Under the district court's reasoning, an objection by one student to an institution's name is sufficient to create a constitutional violation. That reasoning creates a heckler's veto for school names and threatens to spawn a wave of litigation across the circuit aimed at erasing the historical names of government institutions.

To be sure, there is no evidence that the 2024 Board adopted the names out of racial animus—there's no evidence of racism at all. The district court did not find that a single individual Board member was motivated by racial hatred or animosity. The district court nonetheless imputed racist motives to the Board and ordered the Board to adopt new names "on a racially nondiscriminatory basis."

If upheld, the consequences of the district court's opinion are troubling. Throughout the nation, there are thousands of schools,

monuments, streets, and buildings named after historically significant but controversial historic figures. James Madison University is within an hour's drive of the high school. If students or citizens claim stigmatic injury from such names or object to their message on any basis (as many do for James Madison), the lower court's theory would compel these schools to change their identity.

This Court should reverse the judgment below, vacate the permanent injunction, and return these issues to the democratic process, where they belong.

## JURISDICTIONAL STATEMENT

Plaintiffs sued under 42 U.S.C. § 1983, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the Equal Educational Opportunities Act, 20 U.S.C. § 1701 et seq. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3), and 20 U.S.C. § 1706. On September 9, 2025, the court granted summary judgment to Plaintiffs on their First Amendment claim but denied entry of final judgment pending resolution of Plaintiffs' remaining claims. JA0174; JA0175. After a bench trial, the court entered a final judgment disposing of all claims and issuing a permanent injunction on August 6, 2026. JA0330. The School Board filed

a timely notice of appeal on August 31, 2026. JA0337. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether students' voluntary participation in extracurricular activities while wearing school-issued uniforms displaying the team name constitutes compelled speech in violation of the First Amendment.

2. Whether the 2024 restoration of the schools' original names violated the Equal Protection Clause on account of subjective claims of stigmatic harm as proof of disproportionate racial impact while failing to apply the presumption of legislative good faith that *Abbott* requires.

3. Whether the Title VI judgment, which rests entirely on the Equal Protection ruling and identifies no independent Title VI theory, must be reversed or vacated with it.

4. Whether the name of a desegregated school, adopted in 2024, is a "vestige of a dual school system" under 20 U.S.C. § 1703(b).

## STATEMENT OF THE CASE

### I. The Community and Its Schools

Stonewall Jackson High School and Ashby-Lee Elementary School are the center of the southern Shenandoah County community.

Shenandoah County has fewer than 45,000 people, and Quicksburg—the unincorporated community where the schools sit—has fewer than 1,000. In such a small community, the local school is a source of civic character and pride: sports games, concession-stand shifts, diplomas, reunions, and multi-generational attendance keep alumni involved in the life of the school and the community.

Athletics matter in this small-school setting, and "Generals" had been the teams' name since the school's beginning.

## II. School Name Removal and Restoration

### A. The 2020 Board retires the names but keeps the mascot

On June 6, 2020, Virginia's Secretary of Education urged localities to "change school names and mascots that are offensive or that memorialize confederate leaders or sympathizers." JA0340. Twenty days later, the then-sitting Board voted 6–0 for a "[r]esolution condemning racism and affirming the division's commitment to an inclusive school environment for all." JA0340. As the national debate reached Shenandoah County, residents circulated a petition opposing renaming the local schools. JA0363. In a matter of weeks, the petition garnered more than 3,500 signatures.

The Board nevertheless raced forward. It published the July 9 meeting agenda late and on Saturday, July 4, 2020, a holiday weekend. Internal emails said delayed publication would "condense the time that folks contact us," acknowledged concern that the public would think the Board "rushed it through without giving them the chance to weigh in," and rejected a proposal to "delay the action until August and give the community an opportunity to be heard."[1] Another reason for rejecting postponement: "some board members might change their minds!" JA5998.

The published agenda included the item "Next Steps for Resolution." JA0340. The agenda did not reference Policy FFA, which "expressly requires the School Board to seek input from the public prior to changing the names of schools" and to "make every effort to respect the preference of the local school community." JA4842.

On July 9, 2020, the Board voted 5-1 to retire the names Stonewall Jackson High School and Ashby Lee Elementary School. JA0341. The

---

[1] The district court excluded these emails (Defense Exhibit Nos. 2 and 19) during trial on legislative-privilege grounds but later "reviewed and considered" them in its Trial Memorandum Opinion. JA0214 n.16 ("Opn."); JA7003–JA7005. *See* n.2, *infra*.

meeting compressed the standard sequence for major public-interest items—informational item, public comment, then action item—into a single meeting. JA4841–JA4842.

The July 9 meeting was virtual because of COVID-19. JA0341. Opponents warned that many residents could not attend online and would not be heard. JA5379–JA5380. Public comment lasted 80 minutes, drew 25 speakers, and a motion to postpone for greater community input failed. JA0341; JA4845–JA4846.

The Board reaffirmed the vote on September 10, 2020, again 5–1, and on January 14, 2021, selected "Mountain View High School" and "Honey Run Elementary School." JA0342; JA4844.

While changing the school names, the Board voted after a survey and public comment in February 2021 to keep "Generals" as the name and mascot. JA5738–JA5739. Former Principal Dorman testified that keeping the name was the one point on which both sides coalesced. JA7205–JA7206.

### B. Voters elect a new Board, and a 2022 motion fails

The community response was swift. Over the next two election cycles, all six members of the 2020 Board were replaced by candidates

committed to restoring or reconsidering the names, who averaged 67% of the vote. JA0349. In 2021, voters elected Dennis Barlow, Kyle Gutshall, and Brandi Rutz, each of whom openly opposed the 2020 decision. JA0219–JA0220. The newly elected members criticized the 2020 process for failing to follow Board policy and ignoring the community. JA0223–JA0224; JA5745–JA5759.

### C. The 2024 Board restores the names

In November 2023, voters elected Gloria Carlineo, Michael Rickard, and Thomas Streett, each of whom campaigned, in part, on restoring the names. JA0227, JA0229. On April 3, 2024, the Coalition for Better Schools asked the Board to restore the names and submitted a survey reporting 91.3% of respondents favored restoration. JA0355–JA0356.

The parties stipulated that "[t]he School Board followed the required process prior to voting to restore the school names: it placed an informational agenda item on April 11 meeting, held an April 22 work session with Policy FFA discussion and public comment, and received further public comment before the May 9 vote. JA4848–JA4849.

On May 9, 2024, the Board heard more than three hours of public comment from 78 speakers and considered written and in-person

comments, meeting minutes from 1959, historian submissions, and student comments on the names' effects. JA0343; JA4849, JA4851.

In the early morning of May 10, 2024, the Board voted 5–1 to restore the names, with Mr. Gutshall dissenting. JA0344–JA0345. Private donations covered the restoration costs, and the 2024 Board did not reference the June 2020 resolution. JA4845, JA4850, JA4852.

### D. The 2024 Board's intent[2]

---

[2] The district court granted Plaintiffs' motion in limine to prohibit the Board from offering evidence of its members' motivation for the 2024 vote because members invoked legislative privilege during discovery. JA2571. During trial, the court applied this ruling to exclude exhibits and testimony "on the issue of the intent of the school board members in 2024." JA6621. The court acknowledged this "case would be very different" but for legislative privilege. *Id.*

The court, however, reversed course in its opinion and "considered" statements from the "recording and transcript of the May 9, 2024, School Board meeting," including members' "public statement[s] prior to the vote." JA0278. And the court explained that the "stipulation of the parties as to contemporaneous statements that appear on the public record of these meetings allows the court to examine them under the *Arlington Heights* framework." JA0301 n.35.

While the court excluded some testimony during trial, it allowed other testimony in over Plaintiffs' objections and committed to give it the proper weight. JA6622. To the extent Plaintiffs argue that the court did not (or should not have) considered this highly probative evidence, the Board reserves the right to argue that the court's legislative-privilege and limine rulings were error.

The district court evaluated the Board's motivation for the 2024 vote through members' public statements at the April 22 and May 9, 2024 meetings. Many statements were incorporated into the Joint Statements of Stipulated Facts, and the parties stipulated to the admissibility of the approved agendas, minutes, and meeting transcripts. JA2573–JA2574; JA0357–JA0365.

During the April 22 work session, Ms. Carlineo said that if the 2020 vote "had been done right … we wouldn't be here today," and that she wanted to "do it properly" and "fix a mistake." After that, if "the community feels like the names have to be changed, then we do it the right way." JA0362. Mr. Barlow called the 2020 vote "a case study in tamping down democracy" and warned that if he detected a "whiff of racism" in the restoration vote, he would "switch my vote the other way." JA0363; JA0350.

Other members echoed the process rationale: Mr. Gutshall called the 2020 process "unethical and unfair," Mr. Streett said it "just wasn't done right," Ms. Rutz said "the way the process was done was wrong," and Mr. Rickard described the restoration vote as "righting a wrong and

giving the public an opportunity again." JA0357, JA0358, JA0362, JA0235.

At the May 10 vote, Ms. Carlineo said her vote "comes down to the process of how the names were changed in the first place"; Mr. Rickard regretted that "four years ago, the process wasn't followed"; Mr. Streett called the 2020 decision a "knee-jerk reaction"; and Mr. Barlow said "there has to be redress" for the 2020 process. JA4797–JA4804. Mr. Gutshall, the lone dissenter, agreed there had been "some sort of process this time around. We've heard the community." JA0344, JA4803–JA4804, JA0246. The overwhelming evidence shows a Board motivated to right the process wrongs of the rushed (and virtual) 2020 Board decision. *None* of the 2024 Board statements show any racial ill-will whatsoever.

**E. Historical origins of the names**

The 2024 Board members knew of local historical ties to the school names. In the 1950's, the county constructed three new high schools. Two were named for geographical reasons—Strasburg High School for the town and Central High School for its central location. But a local historian urged naming the south-area high school for Jackson because

the Valley Pike area was a setting for Jackson's Shenandoah Valley campaign. Ms. Rutz testified that Rude's Hill, "a spot where Stonewall had encamped at one time," lies within yards of the high school and that "there are Civil War markers all over the county." JA5976–JA5977; JA5351–JA5352.

The school opened as a segregated school; Black students first enrolled in fall 1963 after the NAACP filed and withdrew a lawsuit in 1962, and the County was never under a desegregation decree.[3] JA0339–JA0340, JA0319–JA0320.

Ashby-Lee Elementary opened a decade after desegregation. Five of the county's six districts bore Confederate names, and the new school was unanimously named after the districts it served. JA4845. Both names stood without legal challenge for six decades. JA0295.

## III. Plaintiffs Sue

A month after the restoration decision, the Virginia State Conference NAACP and parents of five students sued the School Board

---

[3] Stonewall Jackson produced the county's first African-American quarterback and its first African-American class SCA representative. JA4778.

in the Western District of Virginia. JA0040. The NAACP and the parents of D.D. and A.J. asserted a First Amendment compelled-speech claim under 42 U.S.C. § 1983; the NAACP and the parents of B.B., A.C., D.D., and J.D. asserted claims under the Equal Protection Clause, Title VI, and the EEOA, 20 U.S.C. § 1703(b).[4] JA0090–JA0100. The School Board is the only defendant; no individual Board member is a party. JA1188, JA1195.

### A. Plaintiffs' alleged injuries

**Plaintiff D.D.**, a student at Stonewall Jackson High School, is "morally opposed to the message" the name sends. She feels "unwelcome and uncomfortable." JA6441. She testified that the name is distracting and makes her feel "conflicted" when she competes as a "General." JA0253–JA0254. Her uniforms do not say "Stonewall Jackson," depict Confederate imagery, or carry any slogan. JA0109 (school uniform examples, pictured below). She was and remains a straight-A student, plays varsity basketball and soccer, was eligible for varsity letters, and

---

[4] In practice, EEOA suits have targeted segregation and the logistical mechanisms (e.g., district assignments and busing) historically used to preserve segregated schools. *See*, *e.g.*, *United States v. School District of Ferndale*, 577 F.2d 1339 (6th Cir. 1978).

testified that her teachers are nice and have her best interests at heart. JA6460–63.




**Plaintiff J.D.**, D.D.'s younger sister, attended Ashby-Lee Elementary School and now attends middle school. JA0255. She testified that she felt "sad" and "uncomfortable" about the restored names, but continued earning good grades and playing sports. JA0256. She testified that she does not believe the restoration affected her mental health or caused her stress or anxiety. JA6471.

**Plaintiff B.B.** attended the Massanutten Regional Governor's School housed in the Stonewall Jackson building. JA0256–JA0257. She testified that the restored name heightened her anxiety and made her feel unwelcome. JA0259–JA0260. Her grades rose after restoration, she

testified that people at school did not make her feel unwelcome and that she never experienced racial prejudice there, and she now attends the University of Virginia. JA6500–JA6502.

**Plaintiff A.C.** also attended the Governor's School in the Stonewall Jackson building, described the restored name as "almost like an invisible ball and chain," and testified that his grades "drop[ped] off a little bit" in his senior year, partly because of more advanced coursework. JA0261, JA0263–JA0264. He never competed as a "General," but he played sports for Strasburg High School and now attends James Madison University. JA0264.

**Plaintiff A.J.**, a White student and plaintiff only on the compelled-speech claim, attends Stonewall Jackson High School and the Governor's School, participates in multiple extracurricular activities, and says he is "morally opposed" to the ideals the Confederate generals signify. JA0045, JA0090–JA0092. He has never been threatened or pressured to represent "Stonewall Jackson," and he requested and received scholastic-bowl shirts that did not say "Stonewall Jackson." JA0115–16.

Plaintiffs' pediatric expert, Dr. Adiaha Spinks-Franklin, testified generally about racism's effects on Black children, but she did not

interview, examine, or diagnose any plaintiff, and she did not opine that any plaintiff suffers from any cognitive, learning, memory, or social impairment. JA0266–JA0270.

## IV. Proceedings Below

### A. The district court grants Plaintiffs' motion for summary judgment

On September 9, 2025, the court denied the Board's summary-judgment motion and granted Plaintiffs' motion on the compelled-speech claim, concluding that "the reasons given for the 2020 decision to retire the name … and the highly charged reversal of that decision in 2024, render the name 'Stonewall Jackson High School … so exceptionally symbolic" that it transformed extracurricular conduct into expressive conduct. JA0140, JA0172.

### B. The district court rules against the School Board on the remaining issues

On August 6, 2026, after a five-day bench trial, the court ruled for Plaintiffs on every remaining claim. JA0189–JA0190, JA0328. It held that former students B.B. and A.C. lacked live claims because they had graduated but treated their testimony as "relevant and probative." JA0281–JA0282.

The court permanently enjoined the Board to remove the names "Stonewall Jackson" and "Ashby-Lee" and to adopt new names "on a racially nondiscriminatory basis with all deliberate speed." JA0331, JA0336.

## SUMMARY OF ARGUMENT

The district court held the 2024 restoration decision unlawful on every theory Plaintiffs advanced. Each holding makes the same mistake: it lets the meaning and purpose that others ascribe to the names stand in for law, evidence, and actual intent.

Start with the uniforms. The district court held that participating in extracurricular activities while wearing school attire constituted compelled speech. But a jersey reading "Generals"—the very mascot the 2020 Board kept—tells an observer only that the wearer plays for the school. To the extent the uniforms are communicative at all, that message is the Board's government speech, and no one is compelled to carry it; a student who declines an extracurricular activity simply does not participate. Yet the court applied strict scrutiny and demanded that the Board justify "Stonewall Jackson" itself. No precedent endorses such a limitless demand, which could be made by any student to any mascot on

any basis. That is a heckler's veto on steroids. And the court compounded the error by granting the broadest remedy available: erasing the government's own message when narrower alternatives existed.

The Equal Protection ruling fares no better. To prove disproportionate impact, Plaintiffs relied on subjective evidence of stigmatic harms but could not demonstrate a measurable race-based burden. Faced with Plaintiffs' stellar academic records, the court held that success itself proves harm. Worse, regarding the Board's motive, the court withheld the presumption of legislative good faith, imputed to the 2024 Board the motives of its predecessors, and reasoned in a circle: because race motivated the 2020 removal, it must have motivated the 2024 restoration—and because race motivated the restoration, the Board's process-based explanation must be pretext. Applying the correct level of scrutiny, the decision easily survives rational-basis review—the court itself called the Board's rationale "not unreasonable"—and because Title VI reaches only intentional discrimination, the Title VI judgment falls with it.

Nor does the EEOA make federal courts arbiters of school names. The "vestiges of a dual school system" that § 1703(b) addresses are the

operational machinery of segregation—student assignment, faculty, transportation, facilities—not the names by which integrated schools are known. Plaintiffs' counsel conceded that no court has applied the concept beyond a school's racial composition. And the causal link is missing in any event: the schools were desegregated by 1963, the County was never under a decree, and the names were restored by a new vote in 2024—a new legislative act, not a remnant.

When citizens disagree about how to name their schools, the check is the next election—not a federal injunction. This Court should reverse.

## STANDARD OF REVIEW

*Argument I.* This Court reviews the grant of summary judgment on the compelled-speech claim de novo. *Wood v. Arnold*, 915 F.3d 308, 313 (4th Cir. 2019).

*Argument II.* This Court decides de novo the ultimate constitutional question whether the facts found establish an Equal Protection violation. *N.C. A. Philip Randolph Inst. v. N.C. State Bd. of Elections*, 155 F.4th 298, 308 (4th Cir. 2025). It reviews subsidiary factual findings, including the finding of discriminatory motivation, for clear error. *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 219–20 (4th Cir. 2016). Findings

that rest on a misreading of the governing legal standard receive no deference, *Abbott v. Perez*, 585 U.S. 579, 607 (2018), and this Court reverses where "fundamental legal errors … permeate the opinion," *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 311 (4th Cir. 2020).

*Argument III.* The same standards govern the Title VI claim, which rises and falls with the Equal Protection intent finding.

*Argument IV.* Whether § 1703(b) reaches school names is a pure question of statutory interpretation, which this Court reviews de novo. *A. Philip Randolph Inst.*, 155 F.4th at 308.

## ARGUMENT

### V. The District Court Erred in Granting Summary Judgment on the Compelled-Speech Claim

The district court committed five errors: (1) Plaintiffs' extracurricular participation, including wearing uniforms, is not expressive conduct; (2) any message the uniforms convey is the Board's own speech; (3) the school setting demanded a deferential standard of review, not strict scrutiny; (4) voluntary participation without penalty for abstention is not compulsion; and (5) the injunction is overbroad.

Left standing, the district court's ruling creates an untenable and limitless standard. Although the court presented its holding through

anti-segregationist-tinted glasses, it explained that the "critical point" in its First Amendment holding is that the name "'Stonewall Jackson' is expressive." JA0113, JA0156. It did not matter whether the School Board intended to convey a message at all, whether there was "symmetry between the message to which the plaintiff objects and the message the government intended to convey," or whether the message "is benevolent or harmful." JA0156–JA0157. All that mattered was that Plaintiffs objected, for any reason whatsoever, to the meaning they ascribed to the name.

American pluralism has checkered its cities, parks, buildings, teams, monuments, and schools with a vast array of historical and contemporary names and events. Madison, Jefferson, Washington, Mason—the names of countless individuals in the American pantheon are imbued with a complex mixture of virtue and vice. Each name is chosen, and can be rejected, by the community. But the district court's rule lets select offense override a community's democratic choice and invites the losing side to relitigate in court what it could not win at the polls. In its crusade against misperceived racism, the court unwittingly fashioned a cudgel that can be wielded indiscriminately. As one Plaintiff

asked: "if we let them get away with this, what's next?" JA4010. When it comes to political and historical figures, someone is always offended.

This Court has called the heckler's veto "one of the most persistent and insidious threats to first amendment rights," and has recognized that the "same assault" on constitutional values occurs whether the veto responds "to majority sensibilities" or "to the sensibilities of a minority." *Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985). The district court's ruling is a heckler's veto on steroids. Nothing in the Constitution makes federal judges the final arbiters of local nomenclature.

### A. Wearing school uniforms does not qualify as expressive conduct

"[T]he Free Speech Clause itself may constrain the government's speech if … the government seeks to compel private persons to convey the government's speech." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015). A plaintiff must show "(1) speech; (2) to which he objects; that is (3) compelled by some governmental action." *Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015).

Claims of compelled speech based on conduct[5] require two

[5] The district court concluded this case did not involve pure speech, with which conclusion Defendant-Appellant agrees. JA0145.

showings: that the conduct qualifies as speech, and that it conveys a message, as perceived by a reasonable observer, that the conscripted speaker finds objectionable.

Expressive conduct counts as speech only when "[a]n intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Spence v. Washington*, 418 U.S. 405, 410–11 (1974) (per curiam); *accord Texas v. Johnson*, 491 U.S. 397, 404 (1989). The Supreme Court has "extended First Amendment protection only to conduct that is inherently expressive." *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006) ("*FAIR*"). And "the only legally cognizable objectionable message" is the one a reasonable observer would perceive, not the one an objector reads into a government symbol. *Cressman*, 798 F.3d at 963; *see also Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (whether message conveyed an "ideological point of view [plaintiff] finds unacceptable"). If mandatory uniforms don't have communicative intent, then passive exposure to a school's name cannot count as forced private speech.

***Expressive Conduct*:**

Courts applying this inquiry to mandatory uniforms have rejected compelled-speech claims where the required attire or insignia did not convey a discernible, wearer-attributable message. In *Jacobs*, the Ninth Circuit rejected a student's claim that "plain-colored tops and bottoms" forced him to express support for conformity. *Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 438 (9th Cir. 2008). The uniform did "not involve written or verbal expression of any kind," was "passive rather than active," and, "if it conveys a message at all, that message is imprecise, rather than 'particularized,'" so observers were unlikely to understand the student as communicating conformity or community affiliation. *Id.* The Third Circuit reached the same conclusion regarding a regulation requiring a corrections officer to wear an American-flag patch: although the flag is an "obviously expressive element," passive display of the patch was not compelled speech absent evidence that observers would understand it to assert the wearer's beliefs. *Troster v. Pa. State Dep't of Corr.*, 65 F.3d 1086, 1091–92 (3d Cir. 1995).

By contrast, the Ninth Circuit in *Frudden II* held that a uniform shirt displaying "a written message" ("Tomorrow's Leaders") above the logo was expressive conduct precisely because the policy "mandate[d]

*written expression*." *Frudden v. Pilling*, 742 F.3d 1199, 1204–05 (9th Cir. 2014) (*Frudden II*). *Frudden II* stressed that had the "uniforms consisted of plain-colored tops and bottoms, as in *Jacobs*, [the school] would have steered clear of any First Amendment concerns." *Id.* at 1205. But after remand, a later Ninth Circuit panel stated that intermediate scrutiny should have been applied and that the prior panel "failed to apply common sense" by treating an anodyne school motto as compelled speech. *Frudden v. Pilling*, 877 F.3d 821 (9th Cir. 2017) (*Frudden III*).

Here, the uniforms convey only the wearer's status as a student and affiliation with the school. They say only "Generals."[6] They carry no motto, no image, and no slogan. They are worn only when participating in extracurricular school activities. In context, there is no likelihood, let alone the "great likelihood" that *Spence* requires, that a reasonable observer would interpret the uniforms as the students' adoption of a discriminatory message from the Board. *Spence*, 418 U.S. at 411. To borrow Juliet's question, "What's in a name?" William Shakespeare,

[6] One baseball uniform cap includes the letters "SJ," and one football uniform says "Stonewall Jackson," neither of which Plaintiffs had to wear.

*Romeo and Juliet* act 2, sc. 2. On a jersey, the answer is the school's identity, not the athlete's creed.

The 2020 Board's own actions confirm that understanding: it retained "Generals" as the mascot despite its resolution condemning racism. JA5738–JA5739. The compelled-speech claim therefore fails at the *Spence* threshold.

***Objectionable Message*:**

Even if wearing the uniform were expressive conduct, the inquiry is whether Plaintiffs object to the message a reasonable observer would perceive, not to their own interpretation. *Cressman*, 798 F.3d at 963.

The district court spent more than 10 pages describing the controversy surrounding the School Board's 2020 and 2024 renaming decisions. JA0148–JA0161. The court concluded that a reasonable observer would perceive the school's name to "symbolize racial exclusion." JA0160.

Several fatal errors plague the court's conclusion. First, the district court falsely equated the complex messages of the school's controversial renaming history with the simple message of a uniform bearing the name

"Generals." But donning a uniform conveys only the message a reasonable observer would attribute to the uniform itself.

Second, the district court relied on extensive commentary from the Board, the community, and expert witnesses to ascribe meaning to the school jerseys. But *FAIR* cautioned that when conduct communicates only because of "the speech that accompanies it," that need for explanation "is strong evidence that the conduct at issue [] is not so inherently expressive that it warrants protection." 547 U.S. at 66. Here, the court's heavy reliance on the context of the renaming decisions highlights that Plaintiffs' extracurricular conduct is not inherently expressive.

Third, the district court concluded the name was "uniquely expressive." JA0161. This rationale makes First Amendment protection turn on the intensity of a local controversy. But government symbols are "almost certain to evoke different thoughts and sentiments in the minds of different observers," and the message a government symbol conveys "may change over time." *Pleasant Grove City v. Summum*, 555 U.S. 460, 475, 477 (2009). A rule that turns ordinary student affiliation into compelled speech whenever it becomes controversial is boundless.

No Plaintiff objects to the only message a reasonable observer would perceive: affiliation with a team, not endorsement of a namesake.

### B. The Board, not the students, spoke

The Free Speech Clause "restricts government regulation of private speech; it does not regulate government speech." *Summum*, 555 U.S. at 467. The district court blurred this line by treating extracurricular uniform requirements as conscripting private speech. But a public school's name is the Board's own speech. It is chosen by elected officials, used as an official governmental identifier, displayed on public property, and attached to school-sponsored activities the public attributes to the school. *Walker*, 576 U.S. at 207–13. The question is whether D.D. and A.J. have been forced to adopt that governmental message as their own.

They have not. Nor would any reasonable observer attribute the schools' message to the student.

The district court relied on *Wooley* and *Barnette* to argue that the government-speech doctrine is no defense to compelled private speech—true, as far as it goes. But *Wooley* barred New Hampshire from prosecuting a Jehovah's Witness for covering "Live Free or Die" on his own license plate, 430 U.S. 705, and *West Virginia State Board of*

*Education v. Barnette* struck down a rule requiring students to salute the flag and recite the Pledge, 319 U.S. 624 (1943); in both, the government made private people voice its message.

Some courts have assumed without deciding that school uniforms are not government speech, *see*, *e.g.*, *Jacobs*, 526 F.3d 419, but *Frudden III* questioned that supposition in dicta, disagreeing that the motto "Tomorrow's Leaders" constituted compelled speech under *Wooley*. 877 F.3d at 830. The court would have distinguished *Wooley* because it involved "speech by driving-age adults in a public forum rather than speech by students in the nonpublic forum of an elementary school," and because the motto in *Wooley* was a "political, content-based statement" whereas the school's motto was an "[a]nodyne, feel-good statement." *Id.* at 830-31. *Barnette* is similarly distinguishable on the second ground, given the deeply politicized nature of compelled recitation of the Pledge.

So too here. The message signified by the school's name and mascot is controlled by the Board, in a non-public forum, on clothing owned by the school, where observers expect children to bear the insignia of the academy they attend. To the extent it is expressive at all, the "Generals" insignia is a content-neutral statement of affiliation. This is pure

government speech: *Wooley* and *Barnette*'s concerns over conscripted speech do not apply.

### C. Applying strict scrutiny creates a limitless heckler's veto

Even if wearing a uniform were the student's expressive conduct, the Court should reject strict scrutiny. The cases the district court relied on, including *Wooley*, all involved adult speech in a public or professional setting. But students' First Amendment rights in public schools "are not automatically coextensive with the rights of adults in other settings." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988). In *Wood*, this Court held that "the educational process itself may sometimes require a state actor to force a student to speak when the student would rather refrain." *Wood*, 915 F.3d at 319.

The Tenth Circuit applied *Hazelwood*'s "school-sponsored speech" standard of review to a student's compelled-speech claim. Under that standard, schools may "restrict (or compel) speech" if it is "reasonably related to legitimate pedagogical concerns," and courts must give "substantial deference to educators' stated pedagogical concerns." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1290 (10th Cir. 2004) (cleaned up). The court rejected a student's objection to using swear words in an acting-

class exercise. Because the speech was part of the mandated school curriculum, it "bore the school's imprimatur and involved pedagogical interests." *Id.* (cleaned up). The court cautioned: "A more stringent standard would effectively give each student veto power over curricular requirements." *Id.* at 1292.

Similarly, in *Jacobs*, the Ninth Circuit applied intermediate scrutiny to a school's uniform policy. *Jacobs*, 526 F.3d at 432–35. Intermediate scrutiny was appropriate because the school uniform policy was viewpoint- and content-neutral even though the uniforms could "contain the school logo." *Id.* at 432. The court rejected the students' theory that allowing the logo reflected a content- and viewpoint-based "preference for expressions of school pride." *Id.* at 433. The "school logo—an item expressing little, if any, genuine communicative message—does not convert a content-neutral school uniform policy into a content-based one." *Id.* "Whatever marginal expression wearing a school logo implicates," there was no evidence the school intended the logo to be anything more than an "identifying mark." *Id.* (cleaned up).

This Court should adopt this standard, which the Board satisfies. Team uniformity and school identity are legitimate pedagogical concerns.

Courts have recognized "increasing school unity and pride," "promoting good behavior," and "focusing attention on learning" as "important governmental interests" that uniform policies serve. *Id.* at 435 (quoting *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 391–92 (6th Cir. 2005)).

The record here reflects those same interests: the School Board explained that uniformity ensures students "represent the school" as "a cohesive group," JA0974; JA0167, and Plaintiffs' expert agrees that team names "help shape school identity and school pride" and that uniforms are "a critical component of generating the necessary sense of belonging that is fundamental to productive teamwork," JA0496, JA0501. Coaches may and do "establish rules for their sport." JA0115. The school's own handbook treats students as a "representation" of their school, and A.J. attested that he "help[s] with the underclassmen and show[s] them what to do." JA0501–JA0502.

The district court ignored most of the pedagogical interests, applied strict scrutiny, and demanded that the Board justify the specific name "Stonewall Jackson." No court has imposed this requirement. And for good reason: the same impossible demand could be made of any name to

which a student-athlete objects on any basis. A school using the "Oilers" mascot may provoke the ire of climate apologists; the "Blue Devils" will offend an observant Christian; immigrants cannot tolerate the "Eagles" because it is an icon of American imperialism and exceptionalism.

There is no limit to the hecklers' veto the district court's ruling creates. As *Frudden III* cautioned, subjecting such mottos and mascots to strict scrutiny "makes no sense" and "jeopardize[s] a wide-spread and inoffensive practice." *Frudden III*, 877 F.3d at 830–31. "What about a motto 'We Succeed Together'? Some students are loners. What about 'School Pride'? Some students are not proud of their school. What about 'Stand Tall'? Some students are short." *Id.* Aesop decried this folly long ago. In "The Miller, His Son, and the Ass," the miller kept changing course to satisfy each passerby until, by "trying to please everybody, he pleased nobody, and lost his Ass besides." *See* Aesop, *The Miller, His Son, and the Ass*, Libr. of Cong., https://read.gov/aesop/136.html.

### D. Students are not compelled to speak because their participation in extracurricular activities is voluntary

Voluntary participation is not compulsion. The Constitution does not guarantee a right to participate in extracurricular activities or freedom from the consequences of following one's conscience. Courts have

held that there is no due process right to participate in interscholastic athletics. *Mitchell v. La. High Sch. Athletic Ass'n*, 430 F.2d 1155, 1158 (5th Cir. 1970). "By choosing to 'go out for the team,'" student athletes "voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656–57 (1995). Here no student is required to say anything, and any student may decline to participate in extracurricular activities.

### E. The injunction is overbroad

Even if there were a compelled-speech violation, the injunction is overbroad. "[T]he scope of injunctive relief is dictated by the extent of the violation established," and such relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Courts "try to limit the solution to the problem," preferring to enjoin "only the unconstitutional applications" while "leaving other applications in force." *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328–29 (2006).

The compelled-speech cases on which the district court and Plaintiffs rely all imposed the least possible restriction on the

government's own speech. *Wooley*, for instance, barred the State from prosecuting individuals for covering the motto on the license plate but "refused to order the State … to issue … license plates without the state motto." 430 U.S. at 709 & n.7. The district court went further and ordered removal of the government's own message. Many less restrictive options were available: changing the rules requiring uniforms, changing the uniforms, or allowing exceptions. The district court should have considered them first, but it did not because of its mistaken premise that the name and its extracurricular uses are inseparable. If the community objects to the name itself, the Constitution's answer is the ballot box.

## VI. The District Court Erred in Ruling Against the School Board on the Equal Protection Claim

The district court's Equal Protection ruling contains four reversible errors. First, it treated subjective claims of stigmatic harm as proof of disproportionate impact. Second, it withheld the presumption of good faith and imputed to the 2024 Board the motives of its predecessors. Third, its finding of discriminatory intent cannot survive a proper application of the factors set out in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), or the 2024 Board's own consistent, non-racial explanations. Fourth, it applied

strict scrutiny when rational-basis review, which the restoration decision easily satisfies, governs.

### A. The Equal Protection Framework and the Presumption of Legislative Good Faith

The district court acknowledged that the restoration "does not involve explicit racial classification." JA0285. To prevail on an Equal Protection challenge to a facially race-neutral policy, a plaintiff must show "(1) that the policy exacts a disproportionate impact on a certain racial group, and (2) that such impact is traceable to an 'invidious' discriminatory intent." *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 879 (4th Cir. 2023) (citing *Arlington Heights*, 429 U.S. at 264–65). If both showings are made, the policy will "be subject to strict scrutiny review." *Id.* If not, "the rational basis standard of review applies." *Id.*

The first prong asks whether the challenged policy "bears more heavily on one race than another." *Id.* at 880. The discriminatory intent inquiry proceeds in two steps. First, a plaintiff must prove "that racial discrimination was a substantial or motivating factor behind enactment of the law." *Raymond*, 981 F.3d at 303 (cleaned up). Courts weigh four factors—(1) historical background, (2) the sequence of events leading to the law's enactment (including departures from normal procedure), (3)

legislative history, and (4) disparate impact. *Id.* (citing *Arlington Heights*, 429 U.S. at 265–69). In weighing them, "the district court *must* afford the state legislature a 'presumption' of good faith." *Id.* (emphasis in original) (citing *Abbott*, 585 U.S. at 603). Evidence of "past discrimination" neither shifts the "allocation of the burden of proof" nor removes the "presumption of legislative good faith." *Abbott*, 585 U.S. at 603; *see also City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful."). And discriminatory purpose means the decisionmaker selected a course of action "'because of,' not merely 'in spite of,' its adverse effects on an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

The second step—reached only after a plaintiff establishes discriminatory intent—shifts the burden to defendant "to demonstrate that the law would have been enacted without" racial discrimination. *Raymond*, 981 F.3d at 303. At this stage, courts no longer afford a presumption of legislative good faith and must "scrutinize the legislature's *actual* nonracial motivations to determine whether they *alone* can justify the legislature's choices." *Id.* (emphasis in original).

### B. The District Court Erroneously Relied on Stigmatic Harm as Evidence of Disproportionate Impact

The court's judgment cannot stand because Plaintiffs never carried their threshold burden to show that the restoration decision "bears more heavily on one race than another." *Coal. for TJ*, 68 F.4th at 880. The court found that the school names impose "race-based educational, psychological, and dignitary harms that their White peers do not bear." JA0287. But every one of those "harms" reduces to the same thing: the students' sincere but subjective reaction to the meaning they ascribe to a name.

The Equal Protection Clause guarantees that individuals will be ***treated*** equally under the laws, not that they have equal subjective feelings about government action. Courts of appeals have drawn the line accordingly: in an equal protection challenge to a Confederate symbol on public property, impact requires "specific factual evidence" of a "measurable burden" or denied benefit falling on one race; anecdotal, intangible harm does not suffice. *Coleman v. Miller*, 117 F.3d 527, 530 (11th Cir. 1997); *see also NAACP v. Hunt*, 891 F.2d 1555, 1562 (11th Cir. 1990) ("all races are offended"); *Doe ex rel. Doe v. Lower Merion Sch. Dist.*,

665 F.3d 524, 551 (3d Cir. 2011) (absent "racial classifications, arguments regarding stigma are of no avail"). The district court erased that line.

*The record does not show a measurable, differential burden.* The district court identified four categories of impact—academics, extracurriculars, peer relationships, and health. JA0289–JA0291. None is supported by objective evidence of a measurable burden. On academics, the record is unambiguous: D.D. is a straight-A student and varsity athlete; J.D. earned "good grades" before and after the restoration; B.B. earned a *higher* calculus grade after the names were restored and is now at the University of Virginia; and A.C. is thriving at James Madison University. JA0253, JA0255–JA0256, JA0261; JA6500–JA6501. Confronted with that evidence, the court paradoxically found that success itself proves harm, because high achievers "aim for excellence as a way of coping with external racial stress." JA0289. A theory under which good grades and bad grades alike establish impact is unfalsifiable.

The extracurricular and health findings fare no better; they recharacterize the same feelings as educational effects. No Black student was excluded from, or quit, any activity. D.D. still competes in her "Generals" jersey; the harm found is that she feels "conflicted." JA0290.

The health finding rests entirely on Dr. Spinks-Franklin, who never spoke to, examined, or diagnosed a single Black student in Shenandoah County; never considered non-race-based stressors; and never opined that any plaintiff suffers any cognitive, affective, or somatic response to racism. JA0266–JA0270. No plaintiff presented a diagnosis of any physical or mental ailment. Nor did she offer any comparative evidence of how White students fared. The court excused these evidentiary gaps because the students' testimony was "consistent" with the medical literature Dr. Spinks-Franklin described. JA0267, JA0291–JA0292.

The court summarized Plaintiffs' "host of issues" as feelings of inferiority and discomfort, loss of trust, and being reminded of history. JA0292. *Coleman* rejected exactly this showing—"anecdotal evidence of intangible harm to [a few] individuals, without any evidence regarding the impact upon other African–American citizens or the comparative effect of the flag on white citizens, is insufficient to establish disproportionate effects along racial lines." 117 F.3d at 530 (internal quotation marks omitted).

Nor did the court conduct the relative inquiry *Arlington Heights* requires: whether a policy falls more heavily on one race than others.

*Coal. for TJ*, 68 F.4th at 879–80. A.J., a White student plaintiff, holds the same view of the names—that the Confederacy "signified ideals like slavery, racism, and oppression"—and objected as strenuously. JA0110–JA0111. The court instead presumed that a name offending students of every race must fall "more harshly" on Black students. JA0288. *Coalition for TJ* forecloses such presumptions, and a school name every student encounters equally is the equal experience *Palmer* held does not deny equal protection. *Palmer v. Thompson*, 403 U.S. 217, 226 (1971) (no disparate treatment where city closed all public pools rather than desegregating them); *see also Hunt*, 891 F.2d at 1562. Nor is disappointment at losing the Mountain View name, which the court said "magnified" the impact, JA0303–JA0304, a disparate burden; it is the ordinary experience of every citizen on the losing side of a democratic decision. *See Whitcomb v. Chavis*, 403 U.S. 124, 153–55 (1971).

*No appellate court has accepted evidence of stigmatic harm as a basis for disproportionate impact.* Drawing on standing doctrine, the Third Circuit held that plaintiffs must be "personally denied equal treatment" to "show discriminatory impact in the form of a stigma." *Lower Merion*, 665 F.3d at 549–51 (citing *Allen v. Wright*, 468 U.S. 737,

756 (1984)). In the standing context, the Fifth Circuit held that the Mississippi flag's alleged discriminatory message, however strongly felt, was not enough absent a denial of equal treatment, *Moore v. Bryant*, 853 F.3d 245, 249–51 (5th Cir. 2017), and the Eleventh Circuit held this year that a Black resident's revulsion at Confederate tributes—including school names—is a generalized grievance, not a concrete injury, *Johnson v. Mayor of Jacksonville*, 178 F.4th 1240, 1246–48 (11th Cir. 2026).

The district court cited nothing to the contrary. Its authorities—*Crosby*, *Banks*, *Augustus*, and *Smith*—do not hold that a symbol's offensiveness constitutes disproportionate impact under the Equal Protection Clause or Title VI. JA0287–JA0288 (citing, *inter alia*, *Smith v. St. Tammany Par. Sch. Bd.*, 316 F. Supp. 1174 (E.D. La. 1970), *aff'd*, 448 F.2d 414 (5th Cir. 1971)). *Crosby*'s "affront" language merely describes the plaintiffs' allegations at the pleading stage; it is not a holding. *Crosby v. Holsinger*, 816 F.2d 162, 163 (4th Cir. 1987). *Banks* and *Augustus*, discussed below, declined to order the permanent removal of Confederate symbols. *Banks v. Muncie Cmty. Schs.*, 433 F.2d 292, 297–99 (7th Cir. 1970); *Augustus v. Sch. Bd. of Escambia Cnty.*, 507 F.2d 152,

155–57 (5th Cir. 1975). The district court did not apply existing doctrine; it created new doctrine.

This Court should decline to ratify that extension. Disparate-impact analysis has always turned on objective, comparative evidence of how a policy distributes burdens or benefits. In *Washington v. Davis*, the impact was the measurably "greater proportion" of Black applicants who failed a qualifying test—and even that was insufficient without purpose. 426 U.S. 229, 242 (1976). Stigmatic injury, by contrast, is cognizable only for "those persons who are personally denied equal treatment." *Allen*, 468 U.S. at 755 (cleaned up). Here, there is no classification and no unequal treatment: every student, of every race, attends the same school under the same name with no objective evidence of disproportionate outcomes along racial lines.

The court's approach also has no limiting principle. If subjective distress, corroborated only by literature about how a racial group generally responds to perceived slights, establishes disproportionate impact, then any public decision touching historical memory—a monument, a mascot, a street name, a curriculum—exposes a school board to strict scrutiny whenever some students perceive racial meaning

in it. This Court should hold that the impact prong was not satisfied and reverse.

### C. The District Court Did Not Properly Afford the School Board a Presumption of Good Faith

The district court only briefly alluded to the presumption while denying its application. After a cursory recitation of the names' origins, and without considering contrary facts, it summarily concluded: "Notwithstanding the presumption of legislative good faith, it is inescapable that the School Board's decision to restore the Confederate school names rests on a historical foundation of racial discrimination." JA0295.

The court's analysis of the remaining *Arlington Heights* factors—which fails to even mention the presumption of good faith, let alone apply it—is even more egregious:

- "[I]nasmuch as the School Board's decision to retire the Confederate school names in 2020 was solely motivated by considerations of race, it is impossible to conclude, in the absence of any intervening event negating those racial connotations, that the restoration of those names in 2024 was not motivated, at least in part, by race." JA0298.
- "[T]he school names are so inextricably bound up with racial discrimination in Shenandoah County that restoring them can only be understood as a decision, at least in part, about race." JA0304.

The court repeatedly deploys phrases like "it is impossible to conclude," "can only be understood," "it is inescapable," and "necessarily embraces." These statements are conclusory, and even when the court tries to justify them, it relies on the names' historical origins or the 2020 Board's decision to replace them.

In condemning the school for these "original sins," the district court commits several cardinal sins of its own.

***First***, the district court impermissibly relied on the racial motivations of the past to "flip[] the evidentiary burden on its head." *Abbott*, 585 U.S. at 603. A "finding of past discrimination" neither shifts the "allocation of the burden of proof" nor removes the "presumption of legislative good faith." *Raymond*, 981 F.3d at 303.

Yet after concluding the restoration decision rested "on a historical foundation of racial discrimination," the court never again considered the presumption. Instead, it challenged the Board to disprove inferences drawn from that narrative—faulting the Board for failing to provide "new evidence" between 2020 and 2024 "that would negate the names' discriminatory effect," JA0297, and treating statements from the 2020

Board as unrefuted proof that "race and racial discrimination were on the table," JA0303.

These were not merely "stray comments." *Abbott*, 585 U.S. at 605. They pervaded the district court's analysis and "made explicit the burden-shifting that the court engaged in while assessing the *Arlington Heights* factors." *Raymond*, 981 F.3d at 304. The district court treated the origins of the schools' names and the 2020 Board's race-conscious removal as binding premises, then demanded that the 2024 Board disprove those premises to purge the taint of discriminatory intent. This inversion of the evidentiary burden is "unmistakable error." *Id.* at 303.

This Court has repeatedly enforced that rule, reversing intent findings that treated a prior legislature's "taint" as effectively dispositive, *Raymond*, 981 F.3d at 303–05, 311, or placed "outsized weight on historical background," *Farm Lab. Org. Comm. v. Stein*, 56 F.4th 339, 353 (4th Cir. 2022).

***Second***, by imputing a *historical* discriminatory motive to the 2024 Board, the court failed to resolve the "ultimate question . . . whether a discriminatory intent has been proved" in this case. *Abbott*, 585 U.S. at 604. The 2024 Board's intent is all that matters. Not the 2020 Board's,

nor the original namers'. And the 2024 Board is "entitled to its own presumption of legislative good faith, regardless of the sins of its predecessor." *A. Philip Randolph Inst.*, 155 F.4th at 309.

The court's guilt-by-association reasoning fails as a matter of law. *Abbott*, 585 U.S. at 605 ("[T]here can be no doubt about what matters: It is the intent of the [enacting] Legislature."). The 2024 Board does not have to prove that it had a "change of heart" or disassociate itself from prior school boards or historical context, and arguments built on such historical evidence are "plainly insufficient" to overcome the presumption of good faith. *Raymond*, 981 F.3d at 304.

***Third***, the opinion contains fatal logical flaws. The court reasoned that because the 2020 decision was "solely motivated by considerations of race," the 2024 restoration "necessarily embraces the ideals for which Lee, Jackson, and Ashby fought—including the enslavement of Black people." JA0298, JA0307. That conclusion is a non sequitur. If a person cuts confections from their diet for the purpose of losing weight, it does not follow that reintroducing sugar is for the purpose of becoming obese. And so here. The restoration decision does not demonstrate that the 2024 Board's motivation was the antithesis of the 2020 Board's.

The court's reasoning also collapses the difference between the Board's awareness of the names' racial salience and proof that the Board acted with invidious discriminatory intent. But "proving discriminatory intent requires more than sheer 'awareness of consequences.'" *Coal. for TJ*, 68 F.4th at 883. The 2024 Board was aware of the names' racial sensitivity but disagreed with its predecessor's conclusion that the names were racially discriminatory and criticized its failure to follow proper process. A later-elected body may disagree with a predecessor's race-conscious policy without acting because of a desire to harm the group the predecessor sought to protect; the "simple repeal or modification" of such policies is not presumptively invalid. *See Crawford v. Bd. of Educ.*, 458 U.S. 527, 538–39 (1982) (foreseeable adverse impact cannot demonstrate invidious discriminatory intent).

Finally, the district court commits the fallacy of post-hoc-ergo-propter-hoc reasoning. Because the 2020 decision was about race, the court concluded that the 2024 reversal must have been about race in an invidious sense. It then rejected the Board's counter-explanation—that it sought to rehabilitate proper democratic processes—because "[t]he evidence conclusively established" that the restoration "was enacted with

impermissible racial motivation." JA0305–JA0306. The burden-shifting step repeats the loop: because racial inequality was "the sole reason" for the 2020 retirement, the Board's argument that race played no role in 2024 "falls flat," JA0308–JA0309, and because race motivated the restoration, the Board cannot show that the same decision would have been made without it, JA0310. In the very analysis meant to determine whether a constitutional violation occurred, the court assumed one and used that assumption to dismiss the Board's justification as merely "plausible" or "not unreasonable." JA0310. Democracy may not excuse a constitutional violation, but the court had to find a violation before treating democratic accountability as pretext. The presumption of good faith requires the opposite approach: where a lawful, nonracial explanation is plausible, the court must credit that inference unless Plaintiffs' proof overcomes it.

### D. Application of the Presumption of Good Faith Cannot Support a Finding of Invidious Discriminatory Intent

"Once the proper burden and the presumption of good faith apply," Plaintiffs cannot meet their burden to show that the 2024 School Board acted with discriminatory intent in restoring the original school names. *Raymond*, 981 F.3d at 305.

*Historical background*. The Board does not deny the relevance of the 1959 naming and Massive Resistance history. But historical background is only "one evidentiary source." *Arlington Heights*, 429 U.S. at 267; *Abbott*, 585 U.S. at 603–04. It cannot become dispositive. The 2024 restoration decision was made by a different Board six decades after Shenandoah County integrated its schools.

*Sequence of events*. The 2020 Board's decision came amid the national turmoil following George Floyd's death. But opposition to removing historic school names was not ipso facto the product of invidious discriminatory motives. In 2020, a petition opposing renaming drew over 3,500 signatures, and the district court found that both sides were represented in public comment. And while some individuals opposing societal changes may have had racist intent, Plaintiffs were required to prove that the 2024 Board acted with discriminatory purpose.

In its rush to follow the prevailing political winds, the 2020 Board departed from its ordinary process: it noticed the item over the Fourth of July weekend, collapsed a multi-step process into a single action item, omitted any reference to Policy FFA, and rejected delay while residents were trying to present a petition.

The district court characterized the 2024 vote as a "strange about-face." JA0297–JA0298. But an equally—if not more—plausible interpretation is that the vote reflected ordinary democratic accountability; "the natural response" to the "newly identified problem" of the 2020 Board taking an action the community disagreed with. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 35 (2020). The sequence shows political contestation and local control, not discriminatory purpose—and it supports no inference of bad motive, "certainly not an inference strong enough to overcome the presumption of legislative good faith." *Raymond*, 981 F.3d at 305. Cases finding that the sequence of events supported an inference of discriminatory motive look nothing like this one. *See*, *e.g.*, *McCrory*, 831 F.3d at 228–29 (omnibus voting law enacted right after *Shelby County v. Holder*, 570 U.S. 529 (2013), passed both chambers in three days, with two hours of House debate and no chance to propose amendments).

*Departures from normal procedural sequence.* An atypical procedural sequence "might afford evidence that improper purposes are playing a role." *Arlington Heights*, 429 U.S. at 267. The district court described the Board's replacement of counsel and the Coalition's

involvement as a procedural departure casting a "long negative shadow." JA0299–JA0301. But elected bodies routinely select counsel aligned with their legal and policy views, and advocacy groups routinely press public bodies to adopt their preferred policies. The court itself acknowledged that "the involvement of interest groups in the political process is ordinary," not anomalous. JA0301. Without a concrete link to an invidious racial objective, the change of counsel and advocacy evidence cannot overcome the presumption of good faith.

*Legislative history*. The legislative history of a decision "may be highly relevant" to the determination "where there are contemporary statements by members of the decision-making body, minutes of its meetings, or reports" that shed light on the purpose of the official action. *Arlington Heights*, 429 U.S. at 268. Although the district court acknowledged that the 2024 Board members' public statements were in evidence and that it considered them, JA0278; JA0301, it did not weigh those statements in its *Arlington Heights* analysis. Instead, the court emphasized statements from the 2020 School Board and comments from the community describing the perceived discriminatory impact of the

original names, then used that evidence to impute discriminatory intent to the 2024 Board's restoration decision. JA0303.

The 2024 Board members' own statements show that the purpose of the restoration decision was not racial animus. As set out in the Statement of the Case, every member who voted to restore the names—and even the lone dissenter—described the 2020 process as the problem. JA0357, JA0358, JA0362–JA0363.

*Disparate impact*. The threshold impact inquiry doubles as the final *Arlington Heights* factor. *Coal. for TJ*, 68 F.4th at 879–80. For the reasons in Section II.B, stigmatic harm from a facially neutral school name that every student encounters equally does not satisfy it—and here, too, the district court assessed the factor without the presumption of legislative good faith.

### E. The Board Offered Legitimate, Non-Racial Reasons for Restoring the Original Names

Even setting aside the presumption of good faith, the court's holding that the Board's decision could not be explained on grounds other than race does not survive.

*The court treated what the names mean to others as proof of what the Board intended*. It reasoned that the names are "so inextricably

bound up with racial discrimination" that restoring them "can only be understood" as a decision about race, relying on the students' testimony that, "to them," the names convey "racial separation and oppression." JA0304–JA0305. But how a symbol is received is not evidence of the Board's motivation when voting for it. The passions of the partisan cannot be imputed to the legislature. *Arlington Heights* directs courts to "contemporary statements by members of the decisionmaking body," 429 U.S. at 268, and this record is "devoid of any statements by Board members, meeting minutes, or other documentation showing" that the school names were restored "because of a specific intent" to "bring hardship" to Plaintiffs. *Coal. for TJ*, 68 F.4th at 883 (internal quotation marks omitted).

*The district court erroneously disregarded evidence of the Board's motivation*. The court held the restoration "unexplainable on grounds other than race," JA0304, based on the 2020 Board's motivations for removing the names: "the 2020 School Board removed the Confederate names as a way of condemning racism." JA0307. Like the ghost of Banquo, the specter of the 2020 decision kept its seat at the table. *See* William Shakespeare, *Macbeth* act 3, sc. 4.

But *Arlington Heights* cautioned that cases of "a clear pattern, unexplainable on grounds other than race … are rare." 429 U.S. at 266. One of its examples, *Gomillion v. Lightfoot*, involved redrawing voting district boundaries to remove "all save four or five of its 400 Negro voters while not removing a single white voter." 364 U.S. 339, 341 (1960). The Court likened the "irresistible" conclusion to a "mathematical demonstration[] that the legislation is solely concerned with segregating white and colored voters." *Id.* The Board's decision to reinstate the original names bears no resemblance to *Gomillion*, neither in the scope or severity of the alleged impact nor the transparency of its motivation.

To the contrary, each member who voted to restore the names gave the same reason, consistently and in public before the vote: the 2020 Board committed procedural errors that shut the community out of a decision about its own schools. The district court did not find that any member was lying. Instead it conclusorily declared the Board's action "outcome driven" and labeled the process concerns "at least in part, pretextual." JA0305, JA0310. A finding that disregards the decisionmakers' own consistent explanations in favor of the meaning third parties attach to the result is clearly erroneous.

Even at the burden-shifting step, the court's analysis runs in the same circle, as Section II.C explains: it assumes the violation and then uses the assumption to defeat the explanation.

Viewed on the whole record, the Board's account is not only plausible, it is the most natural reading of the evidence. The members who restored the names campaigned on revisiting the 2020 decision, allowed extensive public comment, and confirmed that respect for democratic process was the basis for their decision.[7] JA0277; JA0357–JA0359.

### F. The 2024 Board's Restoration Decision Easily Survives Rational Basis Review

The district court incorrectly applied strict scrutiny. Because Plaintiffs cannot prove invidious discriminatory motive, the restoration is reviewed for a rational basis. *Coal. for TJ*, 68 F.4th at 887. The court's reliance on *Louisiana v. Callais* is inapposite. *See* 146 S. Ct. 1131 (2026) (applying strict scrutiny).

---

[7] The district court suggested that concerns over the 2020 process were "extinguished" when the Board considered the issue in 2022. Not only does the district court incorrectly state that no one "voiced any concerns over the 2022 process," a 3–3 stalemate in 2022 did not affirm the 2020 process or insulate the issue from further democratic reconsideration after another Board election.

Under the correct standard, the decision must be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis" for it. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). The Board need not produce evidence, and Plaintiffs bear the burden "to negative every conceivable basis which might support it." *Heller v. Doe*, 509 U.S. 312, 320 (1993) (citation omitted). Restoring public trust in the Board's legitimacy and correcting a decision its constituents viewed as procedurally defective are paradigmatically legitimate interests. JA0311. The district court conceded that the Board's process rationale was "not unreasonable," which is all that rational basis demands. JA0310.

## VII. The Title VI Claim Fails with the Equal Protection Claim

The Title VI judgment rises or falls with the Equal Protection judgment. Section 601 of Title VI prohibits exclusion from, denial of benefits of, or discrimination under a federally assisted program "on the ground of race, color, or national origin." 42 U.S.C. § 2000d. Private plaintiffs may enforce § 601, but "Title VI itself reach[es] only instances of intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 279–81 (2001); *Peters v. Jenney*, 327 F.3d 307, 315 (4th Cir. 2003).

The district court ruled that the School Board's violation of the Equal Protection Clause also violates Title VI. JA0313. It did not identify any independent Title VI theory. To the extent Plaintiffs failed to establish discriminatory intent or the court's legislative privilege rulings distorted the Equal Protection intent findings, reversal or vacatur of the Equal Protection judgment requires the same for Title VI.

## VIII. The District Court Erred in Holding That the Restoration Decision Violated the Equal Educational Opportunities Act

The crux of the district court's EEOA ruling, which it acknowledged concerned a "question of first impression," is that the Confederate school names qualify as a "vestige[] of a dual school system." 20 U.S.C. § 1703(b); JA0320. That premise is wrong. The statutory text and precedent show that "vestiges" refers to the operational machinery of a dual school system susceptible to objective measurement—student assignment, faculty, transportation, facilities, and comparable school operations—not to school names or symbols.

Plaintiffs' counsel conceded that no court had applied the EEOA's vestiges concept outside "the racial composition of the school." JA7443. And the court's historical findings about the names' origins cannot

answer the antecedent legal question whether a name is something § 1703(b) regulates.

### A. The EEOA's Text Does Not Encompass Confederate School Names

Start with the statutory text. Section 1703 prohibits states from denying "equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by … (b) the failure of an educational agency which has formerly practiced such deliberate segregation to take affirmative steps, consistent with part 4 of this subchapter, to remove the vestiges of a dual school system." 20 U.S.C. § 1703(b). What are "vestiges"? The EEOA does not define the term, and the dictionary—"a trace, mark, or visible sign left by something … vanished or lost"—is of limited help. *Hanover Cnty. Unit of the NAACP v. Hanover Cnty.*, 461 F. Supp. 3d 280, 300 (E.D. Va. 2020).

The statute's structure clarifies the term. Congress defined the EEOA's purpose as "specify[ing] appropriate remedies for the orderly removal of the vestiges of the *dual school system*," which it described as one "in which students are assigned to schools solely on the basis of race, color, sex, or national origin." 20 U.S.C. §§ 1701(b) (emphasis added), 1702(a)(1). Congress then identified the practical problem: educational

entities may be required to "reorganize their school systems, to reassign students, and to engage in the extensive transportation of students," and courts needed "a clear, rational, and uniform standard" for "fashioning remedies … in order to eliminate the vestiges of a dual school system." *Id.* § 1702(a)(2), (6). The objective was to dismantle the dual system's logistical and organizational apparatus, not to eradicate every symbol later associated with race.

The surrounding provisions confirm that reading. Section 1703(a) concerns "deliberate segregation" of students "among or within schools"; § 1703(c) concerns assignment away from neighborhood schools when that assignment increases segregation; § 1703(d) concerns faculty and staff employment or assignment; and § 1703(e) concerns student transfers made with the "purpose and effect" of increasing segregation. And the removal of vestiges must be "consistent with part 4 of this subchapter," whose remedies concern neighborhood assignment, transfers, attendance zones, school construction or closure, magnet schools, and residual plans that are educationally sound and administratively feasible. *See* 20 U.S.C. §§ 1712–18.

Section 1703(b) thus sits among provisions regulating the operations of a school system, not the names by which schools are known. A school name is not an assignment rule, transportation plan, faculty policy, attendance zone, facility allocation, or extracurricular barrier. It is not part of the machinery by which a dual system separates children by race.

The district court's contrary reading gives "vestiges" in § 1703(b) a meaning drastically broader than the word bears everywhere else. That violates the whole-text and presumption-of-consistent-usage canons and lets plaintiffs evade the very limits Congress intended to impose.

### B. "Vestiges" Means Operational Remnants of a Dual System, Not Historic School Names

Neither Plaintiffs nor the district court identified an ounce of precedent holding that a school name or other symbol of the Confederacy provided grounds for relief under the EEOA. Rather, the Supreme Court's desegregation cases use "vestiges" to describe remnants of the dual system in the operation of schools. *Green v. County School Board of New Kent County* identified the relevant indicia as student assignment, "faculty, staff, transportation, extracurricular activities and facilities." 391 U.S. 430, 435 (1968). *Swann v. Charlotte-Mecklenburg Bd. of Educ.*

confirmed the *Green* factors are "among the most important indicia of a segregated system." 402 U.S. 1, 18, 26–29 (1971). And *Freeman v. Pitts* held that vestiges "may be subtle and intangible," but still "must be so real that they have a causal link to the *de jure* violation being remedied." 503 U.S. 467, 496 (1992).

The district court argued that courts may sometimes consider "other factors." JA0319. But those factors are no roving mandate for courts to consider any alleged disparity whatsoever. Every case the district court cited considered tangible, objective, or measurable evidence of disparity. *See Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 330–32 (4th Cir. 2001) (en banc) (ancillary factors included teacher quality, student achievement, and student disciplinary rates); *Wessmann v. Gittens*, 160 F.3d 790, 800–09 (1st Cir. 1998) (evaluating a "documented achievement gap*"); Coal. to Save Our Child. v. State Bd. of Educ.*, 90 F.3d 752, 776–78 (3d Cir. 1996) ("persistent performance disparities are not vestiges" in light of other socioeconomic factors). In

each case, the court started with statistical evidence of disparity in school operations or outcomes and then considered whether it was a vestige.[8]

Cases applying the *Green* factors likewise look for tangible, objective, or measurable evidence of disparity. *See, e.g.*, *United States v. City of Yonkers*, 833 F. Supp. 214, 225 (S.D.N.Y. 1993) ("achievement scores, suspensions, retentions and drop-out rates"); *Berry v. Sch. Dist. of Benton Harbor*, 195 F. Supp. 2d 971, 978 (W.D. Mich. 2002) ("***measurably*** reduced achievement") (emphasis added); *Anderson v. Sch. Bd. of Madison Cnty.*, 517 F.3d 292, 298–305 (5th Cir. 2008) (statistical data of the school's composition and finances). The Ninth Circuit cautioned that "inequality is not automatically a vestige of segregation" and affirmed unitary status by applying the *Green* factors to "measure the vestiges." *Mendoza v. Tucson Unified Sch. Dist.*, 125 F.4th 1262, 1268–69 (9th Cir. 2025).

---

[8] Even if this Court holds that the district court correctly identified a disproportionate impact, the court still failed to conduct any analysis to determine whether that alleged disparity resulted solely from the schools' names. Such analysis is necessary to determine whether the alleged vestige is causally connected to the de jure system of segregation. *See Coal. to Save Our Child.*, 90 F.3d at 778.

As Section II.B explains, such objective, measurable evidence is wholly lacking here. Former principal Michael Dorman testified that after the 2024 restoration there was no meaningful student-body conflict over the name, no African-American student complained to him, and no slip in academic performance of which he was aware; he testified that the students excelled and that the school had received exemplary or distinguished awards "about every year." JA7212–JA7213.

In the desegregation context, the Confederate-symbol cases underscore the error.[9] In *Augustus*, the district court had permanently enjoined a school's use of the Confederate Battle Flag and the name "Rebels" in pursuit of a "unitary system of education."[10] 507 F.2d at 154.

---

[9] The district court relied on *Smith* as an example of a case ordering the removal of symbols or indicia of racism from a public school. 316 F. Supp. at 1176. The Fifth Circuit affirmed the order of removal on appeal, but clarified that it did so because the symbols "express[ed] the school board's … desire to maintain segregated schools." *Smith*, 448 F.2d at 415.

[10] These desegregation cases considered whether school districts had attained unitary status. A "school district is released from the consequences of its past misdeeds when it eliminates the vestiges of a segregated system and achieves a true unitary system." *United States v. Overton*, 834 F.2d 1171, 1175 (5th Cir. 1987). As these cases make clear, Confederate symbols did not prevent a school from attaining unitary status. The Shenandoah County School Board was never subjected to a unitary status plan, yet the district court's ruling puts such schools in a worse position because there is no final resolution to their segregationist history.

The Fifth Circuit made the injunction temporary and remanded for solutions "short of the total and permanent ban of the symbols," holding that the "community would be better served by … the democratic processes"—a course derailed only by "the violence and disruption that occurred in the educational process." *Id.* at 155–56.[11] Similarly, the Seventh Circuit in *Banks* found Confederate symbols "offensive" and encouraged reconsideration of the names, but it affirmed judgment for the school because there was "no evidence" that Black students "were being denied access to any of the school's facilities." *Banks*, 433 F.2d at 297–98. And *Gray*, the closest case, held that a "Confederates" nickname and "Dixie" were not vestiges "so real that they have a causal link to the *de jure* violation being remedied." *Gray v. Lowndes Cnty. Sch. Dist.*, 900 F. Supp. 2d 703, 712 (N.D. Miss. 2012).

The authorities the district court relied on all concern school operations and court-supervised desegregation, not symbolic naming disputes in an already-integrated system.

---

[11] The Fifth Circuit also cautioned against allowing a minority to manufacture racial injury, e.g. violent disturbances, in order to seek court intervention when the minority was unsuccessful in the democratic process. *Augustus*, 507 F.2d at 156.

### C. The Causal Link Between the Restored Names and the De Jure System Is Too Remote and Too Attenuated

Even if § 1703(b) could ever reach a school name, the judgment fails because the required causal link is missing. *Freeman* is clear: "though we cannot escape our history, neither must we overstate its consequences in fixing legal responsibilities." 503 U.S. at 495–96. As time passes and intervening events accumulate, "it becomes less likely that a current racial imbalance in a school district is a vestige of the prior *de jure* system." *Id.* at 496.

The facts make causation especially attenuated here. Stonewall Jackson High School opened in 1959 and was desegregated by 1963. Ashby-Lee Elementary was named in 1974 and opened after integration. JA0295, JA0325–JA0326. No court ever placed Shenandoah County under a desegregation decree, supervised its transition, or withheld a unitary-status declaration. JA0319–JA0320; JA0335. Most importantly, the Board retired the names in 2020 and restored them in 2024 by a new vote after intervening elections and public debate. JA0327–JA0328. A "vestige" is a remnant left behind by a former condition; it is not a new legislative act six decades later. If the 2024 vote was unlawful, the proper

doctrinal home is Equal Protection or Title VI—not § 1703(b)'s failure-to-remove provision.

The court also found causation in the wrong kind of effect. It relied on Plaintiffs' testimony about feelings of inferiority, strained relationships, anxiety, extracurricular discomfort, and generalized literature on the health effects of racism. JA0326–JA0327. But the controlling rule requires a condition that is causally traceable to the *de jure* system. *Freeman*, 503 U.S. at 496; *Belk*, 269 F.3d at 381. Subjective stigma cannot transform a name into an operational remnant of a dual school system.

### D. The Court Imposed an Affirmative Duty the EEOA Does Not Create

Finally, even assuming a vestige existed, the court imposed a duty greater than the EEOA requires. Section 1703(b) requires affirmative steps "consistent with part 4," and § 1712 permits only remedies "essential to correct particular denials of equal educational opportunity or equal protection of the laws." 20 U.S.C. §§ 1703(b), 1712. The district court relied on § 1713(g)'s residual "educationally sound and administratively feasible" language to order the removal of names. JA0334–JA0335. But a residual remedial clause does not expand the

substantive definition of "vestiges." Here, the schools are integrated, no desegregation decree exists, no *Green*-factor disparity is tied to the names, and the 2024 vote—whatever one thinks of its wisdom—did not assign, transfer, transport, hire, house, or educate any student differently by race. The EEOA gives courts tools to dismantle dual school systems. It does not make them arbiters of school names. The judgment should be reversed.

## CONCLUSION

The Court should reverse the judgment on the First Amendment and EEOA claims. It should reverse the judgment on the Equal Protection and Title VI claims or, at minimum, vacate those judgments and remand for reconsideration applying the correct legal standards. It should vacate the permanent injunction.

Dated: October 27, 2026

Respectfully submitted,
*/s/ Michael Francisco*
Michael Francisco
*Counsel for Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fourth Circuit Local Rule 34(a), Appellant requests oral argument. The appeal presents questions of first impression in this Circuit: whether rules requiring students wear a uniform during elective extracurricular activities constitutes compelled student speech, and whether a school name qualifies as a "vestige of a dual school system" under 20 U.S.C. § 1703(b). Additionally, the district court's ruling on the Equal Protection claim and the Title VI claim adopted a novel approach to these areas of law. Argument would assist the Court.

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 13,000 words.

This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Michael Francisco*
Michael Francisco
*Counsel for Appellant*

## CERTIFICATE OF SERVICE

I certify that on October 27, 2026, I electronically filed the foregoing brief with the United States Court of Appeals for the Fourth Circuit using the CM/ECF system. I certify that counsel for all parties in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Michael Francisco*
Michael Francisco
*Counsel for Appellant*